UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

PRECIOUS B.,[1]

                              Plaintiff                      DECISION and ORDER

-vs-

                                                          1:22-CV-00310 CJS

COMMISSIONER OF SOCIAL
SECURITY,

                              Defendant.
_____

## INTRODUCTION

This is an action brought pursuant to 42 U.S.C. § 405(g) to review the final determination of the Commissioner of Social Security ("Commissioner" or "Defendant") which denied the application of Plaintiff for Social Security Disability Insurance ("SSDI") benefits. Plaintiff contends that the Commissioner erred in rejecting an opinion by a consultative medical expert, that Plaintiff could only use her left hand occasionally, which, if accepted, would have resulted in a finding of disability. Now before the Court is Plaintiff's motion (ECF No. 12) for judgment on the pleadings and Defendant's cross-motion (ECF No. 13) for the same relief. For reasons discussed below, Plaintiff's application is denied, and Defendant's application is granted.

## STANDARDS OF LAW

The Commissioner decides applications for disability benefits using a five-step sequential evaluation process:

---

[1] The Court's Standing Order issued on November 18, 2020, indicates in pertinent part that, "[e]ffective immediately, in opinions filed pursuant to Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), in the United States District Court for the Western District of New York, any non-government party will be identified and referenced solely by first name and last initial."

1

> A five-step sequential analysis is used to evaluate disability claims. *See* 20 C.F.R. §§ 404.1520, 416.920.   First, the Commissioner considers whether the claimant is currently engaged in substantial gainful activity. If he is not, the Commissioner next considers whether the claimant has a severe impairment which significantly limits his physical or mental ability to do basic work activities.[2]  If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in the regulations [or medically equals a listed impairment].  Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity [("RFC")] to perform his past work.[3]  Finally, if the claimant is unable to perform his past work, the Commissioner then determines whether there is other work which the claimant could perform.   The claimant bears the burden of proof as to the first four steps, while the Commissioner bears the burden at step five.[4]

*Colvin v. Berryhill*, 734 F. App'x 756, 758 (2d Cir. 2018) (citations and internal quotation marks omitted).

---

[2]  The Commissioner's Regulations define basic work-related activities as follows: "Basic work activities. When we talk about basic work activities, we mean the abilities and aptitudes necessary to do most jobs. Examples of these include— (1) Physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; (2) Capacities for seeing, hearing, and speaking; (3) Understanding, carrying out, and remembering simple instructions; (4) Use of judgment; (5) Responding appropriately to supervision, co-workers and usual work situations; and (6) Dealing with changes in a routine work setting."   20 C.F.R. § 404.1522 (West 2023).

[3]  Residual functional capacity "is what the claimant can still do despite the limitations imposed by his impairment." *Bushey v. Berryhill*, 739 F. App'x 668, 670–71 (2d Cir. 2018) (citations omitted); *see also*, 1996 WL 374184, Titles II & Xvi: Assessing Residual Functional Capacity in Initial Claims, SSR 96-8P (S.S.A. July 2, 1996).

[4]  "The Commissioner's burden at step five is to show the existence of possible employment for an individual with the RFC determined by the ALJ in the fourth step of the sequential analysis." *Smith v. Berryhill*, 740 F. App'x 721, 726–27 (2d Cir. 2018) (citation omitted). The ALJ typically does this either by resorting to the medical vocational "grids" or, where the claimant has a non-exertional impairment, by taking testimony from a vocational expert. *See, Bapp v. Bowen*, 802 F.2d 601, 603 (2d Cir. 1986) ("[T]he mere existence of a nonexertional impairment does not automatically require the production of a vocational expert nor preclude reliance on the guidelines. A more appropriate approach is that when a claimant's nonexertional impairments significantly diminish his ability to work—over and above any incapacity caused solely from exertional limitations—so that he is unable to perform the full range of employment indicated by the medical vocational guidelines, then the Secretary must introduce the testimony of a vocational expert (or other similar evidence) that jobs exist in the economy which claimant can obtain and perform.").

An unsuccessful claimant may bring an action in federal district court to challenge the Commissioner's denial of the disability claim. In such an action, "[t]he court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C.A. § 405(g) (West). Further, Section 405(g) states, in relevant part, that "[t]he findings of the Commissioner of Social security as to any fact, if supported by substantial evidence, shall be conclusive."

The issue to be determined by the court is whether the Commissioner's conclusions "are supported by substantial evidence in the record as a whole or are based on an erroneous legal standard." *Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998); *see also, Barnaby v. Berryhill*, 773 F. App'x 642, 643 (2d Cir. 2019) ("[We] will uphold the decision if it is supported by substantial evidence and the correct legal standards were applied.") (citing *Zabala v. Astrue*, 595 F.3d 402, 408 (2d Cir. 2010) and *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012).").

"First, the [c]ourt reviews the Commissioner's decision to determine whether the Commissioner applied the correct legal standard." *Tejada v. Apfel*, 167 F.3d 770, 773 (2d Cir. 1999); *see also, Pollard v. Halter*, 377 F.3d 183, 189 (2d Cir. 2004) ("[W]here an error of law has been made that might have affected the disposition of the case, this court cannot fulfill its statutory and constitutional duty to review the decision of the administrative agency by simply deferring to the factual findings of the [administrative law judge] [("]ALJ[)]". Failure to apply the correct legal standards is grounds for reversal.") (citation omitted).

If the Commissioner applied the correct legal standards, the court next "examines the record to determine if the Commissioner's conclusions are supported by substantial evidence." *Tejada v. Apfel*, 167 F.3d at 773.  Substantial evidence is defined as "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id*. (citation omitted).

> The substantial evidence standard is a very deferential standard of review—even more so than the 'clearly erroneous' standard, and the Commissioner's findings of fact must be upheld unless a reasonable factfinder would have to conclude otherwise." *Brault v. Social Sec. Admin., Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012) (per curiam) (emphasis in original). "An ALJ is not required to discuss every piece of evidence submitted, and the failure to cite specific evidence does not indicate that such evidence was not considered." *Id*.

*Banyai v. Berryhill*, 767 F. App'x 176, 177 (2d Cir. 2019), as amended (Apr. 30, 2019) (internal quotation marks omitted); *see also, Snyder v. Comm'r of Soc. Sec.*, No. 22-277-CV, 2023 WL 1943108, at *1 (2d Cir. Feb. 13, 2023) ("While the substantial evidence standard requires we find more than a mere scintilla of support for the Commissioner's decision, it is still a very deferential standard of review requiring us to uphold the Commissioner's findings unless a reasonable factfinder would *have to conclude otherwise*.") (emphasis in original; citations and internal quotation marks omitted); *Schillo v. Kijakazi*, 31 F.4th 64, 69 (2d Cir. 2022) ("We may vacate the agency's disability determination only if it is based on legal error or unsupported by 'substantial evidence'—that is, if no reasonable factfinder could have reached the same conclusion as the ALJ.").

In applying this standard, a court is not permitted to re-weigh the evidence. *See, Krull v. Colvin*, 669 F. App'x 31, 32 (2d Cir. 2016) ("Krull's disagreement is with the ALJ's

weighing of the evidence, but the deferential standard of review prevents us from reweighing it."); *see also, Riordan v. Barnhart*, No. 06 CIV 4773 AKH, 2007 WL 1406649, at *4 (S.D.N.Y. May 8, 2007) ("The court does not engage in a *de novo* determination of whether or not the claimant is disabled, but instead determines whether correct legal standards were applied and whether substantial evidence supports the decision of the Commissioner.") (citations omitted).  "Even where the administrative record may also adequately support contrary findings on particular issues, the ALJ's factual findings must be given conclusive effect so long as they are supported by substantial evidence." *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010) (internal quotation marks omitted).  "In other words, this Court must afford the Commissioner's determination considerable deference, and 'may not substitute its own judgment for that of the [Commissioner], even if it might justifiably have reached a different result upon a *de novo* review.'" *Melia v. Colvin*, No. 1:14-CV-00226 MAD, 2015 WL 4041742, at *2 (N.D.N.Y. July 1, 2015) (quoting *Valente v. Sec'y of Health & Human Servs.*, 733 F.2d 1037, 1041 (2d Cir.1984)).

FACTUAL and PROCEDURAL BACKGROUND

The reader is presumed to be familiar with the factual and procedural history of this action, which is set forth in the parties' papers.  The Court will refer to the record only as necessary to rule on the alleged errors identified by Plaintiff.

Plaintiff claims that she became disabled on November 2, 2017, and her last-insured date ("DLI") was December 31, 2017.  Accordingly, the ALJ's task was to determine whether Plaintiff was disabled during that narrow timeframe. (Tr. 21).  That question turned on the extent to which Plaintiff was able to use her left upper extremity

5

during the relevant period. In that regard, Plaintiff alleged that her ability to use her left arm and hand was limited, due to a neck injury from a motor vehicle accident.[5]

A non-examining consultative medical expert retained by the Commissioner, Janis E. Eiler, M.D. ("Eiler"), reviewed Plaintiff's medical records and opined, in pertinent part, that between November 2, 2017, and December 31, 2017, Plaintiff could only "occasionally" use her left hand to reach overhead, reach in other directions, handle, finger, push, and pull. (Tr. 1044, 1047,1048). When asked to explain what clinical findings supported that opinion, Eiler wrote, "Radiculopathy with weakness and paresthesias [(tingling/prickling)] left arm and hand." (Tr. 1044). More specifically, when asked to explain "the objective medical findings that support[ed] [her] opinion," Dr. Eiler wrote, in pertinent part:

> A cervical spine MRI on 11/1/17 showed multiple disc herniations indenting the thecal sac[.] . . . On orthopedic evaluation on 12/6/17 the claimant had a normal gait, balance, and heel/toe walk, with normal strength and sensation. The claimant later had cervical disc surgery in 2018 and as of January 2020 was considering lumbar surgery for spinal stenosis.

(Tr. 1048). Dr. Eiler also found that Plaintiff's impairments did not meet or medically equal a listed impairment, and when asked to explain why, stated, "During the time period

---

[5] Plaintiff indicated to her doctor at the ER that her car was struck from behind at low speed, after which "she was able to get out of the car immediately to 'cuss a lot' at the other driver." (Tr. 893).  Later that day Plaintiff went to the ER complaining of a headache, but upon examination she appeared to be in no acute distress, and had, specifically with regard to her neck, "full range of motion with no pain."  (Tr. 894). The physician also reported no back pain.  Indeed, the physical examination was completely normal, even though Plaintiff claimed to have been seriously injured a month earlier from a fall down some stairs. (Tr. 894) ("Full range of motion with no pain [in neck.] . . . No obvious deformities/swelling.  Moving all extremities without difficulty.  Normal strength. . . . She reports a mild occipital headache at this time. She has no other injuries."); (Tr. 892) ("Pt reports she fell down stairs on 7/8/17 after tripping on something, resulting in left side of neck and left UE pain to fingers.").

6

11/2/17 through 12/31/17 the claimant was fully ambulatory with effective use of all extremities despite neck, low back and knee pain." (Tr. 1049).  Finally, when asked to reiterate Plaintiff's functional limitations, Eiler wrote, "Limitations as above [(including the limitation on use of her left hand)], mainly based on allegations of pain." (Tr. 1050).

A Vocational Expert ("VE") subsequently testified, in response to hypothetical questions put to her by the ALJ and Plaintiff's attorney, that if Plaintiff could use her left arm and hand to "handle and finger" frequently, then there were sedentary jobs that she could perform, but if she was limited to using the left hand to "handle and finger" only occasionally, then there were no such jobs. (Tr. 58-59) (Assuming Plaintiff also otherwise had the RFC found by the ALJ).   The issue of disability therefore came down to the extent to which Plaintiff could handle and finger with her left hand.[6]

The ALJ agreed with Dr. Eiler that Plaintiff had a severe impairment related to her neck, that affected her ability to use her left upper extremity.   The ALJ noted that Plaintiff had a documented basis for her cervical spine problems, including a November 2017 cervical MRI "which revealed multiple disc herniations indenting the thecal sac." (Tr. 26). Further, the ALJ observed that shortly after Plaintiff's last-insured date, she "underwent an anterior cervical discectomy with disc replacement, after which she "reported in March 2018, that the great majority of her severe pain was improved[,] including her arm pain." (Tr. 26).

---

[6] At the conclusion of the hearing, Plaintiff's counsel argued to the ALJ that the combination of Dr. Eiler's opinion, that Plaintiff could use her left hand only occasionally, and the VE's testimony, that if Plaintiff were limited to using her left hand only occasionally that there would be no jobs she could perform, required a finding of disability. (Tr. 60-61) ("It would be our position that based on the vocational expert testimony today in conjunction with the medical interrogatory at 17F, that a finding of disabled should apply prior to the date last insured.").

However, the ALJ found that even prior to such surgery, Plaintiff could use her left hand to handle and finger frequently, thereby disagreeing with Dr. Eiler's opinion that Plaintiff could only use her left hand occasionally.[7] In reaching that conclusion, the ALJ made several references to Plaintiff's hands and arms throughout her decision, which, when pieced together, state in pertinent part as follows:

> The claimant's November 2017 electromyogram (EMG) and nerve conduction study indicated only mild prolongation of the left median motor and left median sensory nerve action potentials (SNAP) along the region of the left wrist. (Exhibit 3F, pp. 75, 80, 122; Exhibit 6F, p. 14). There is no evidence that she is not able to handle and finger with her left upper extremity and she has never treated for her mild carpal tunnel syndrome.
> 
> ***
> 
> The claimant alleged in writing that she is disabled largely because of "back injury, neck injury." At the hearing, held three plus years after the DLI expired, she testified that she had neck pain radiating into her left extremity as well as associated headaches during the period at issue. She also stated that in 2018, after the DLI expired, she underwent a cervical surgery, but she still has left arm pain and weakness. She said she is required to use her dominant right arm and hand to open jars.
> 
> ***
> 
> With respect to the period at issue, the claimant testified she was involved in a car accident in 2017, and consequently injured her neck and back. She admitted she was able to engage in light household chores such as cooking and cleaning during the period at issue.
> 
> ***
> 
> The claimant reported that her neck pain caused pain radiating into her left shoulder and arm and her lower back pain radiated into her right leg. Nevertheless, she continued to work until November 2017. The claimant sought chiropractic care including soft tissue massage and heat therapy,

---

[7] The ALJ's decision includes the following statement: "Also, I have accounted for the claimant's radiating pain into her left upper extremity by limiting her to occasional use of her left upper extremity." (Tr. 27). At first glance, this statement seems inconsistent with the ALJ's determination that Plaintiff could use her left hand frequently. However, that particular statement by the ALJ appears to refer specifically to Plaintiff using the left upper extremity to reach overhead, which the ALJ found Plaintiff could do only occasionally. (Tr. 25).

8

following the incident, which brought some pain relief.  She reported relief with massage and electrical stimulation.  The claimant reported to her chiropractor that work was aggravating her back pain and she preferred to stop working and focus on healing.

\*\*\*

The claimant reported that her ongoing cervical and lumbar pain was aggravated by sitting, bending, reaching, straining, looking up or down, movement, sleeping, and household chores.  Due to ongoing pain complaints a cervical MRI was conducted in November 2017 which revealed multiple disc herniations indenting the thecal sac.

\*\*\*

Post DLI the claimant underwent an anterior cervical discectomy with disc replacements.  Following this surgery, the claimant reported in March 2018, that the great majority of her severe pain was improved, including her arm pain.

About three years after the DLI, the claimant was involved in a motorcycle accident when she lost control over her motorcycle on a gravel road, and which caused additional injuries to her spine.

\*\*\*

I find that the claimant's statements that she is unable to work are not supported and are not consistent in light of the discrepancies between the claimant's assertions, testimony, and medical record.  The record shows that the treatment the claimant . . . received during the period at issue [was] routine and conservative, consisting mainly of pain management for chronic neck and back pain.  Since her alleged onset date, she underwent chiropractic care and massage therapy and at times she wore a back brace, which provided adequate relief.  Therefore, the evidence fails to substantiate the claimant's allegations of debilitating limitations.  Accordingly, I find that the claimant's testimony and allegations are not fully consistent with the evidence of record.

\*\*\*

As for the medical opinions . . . I find the opinion of the medical expert Dr. Janis E. Eiler not entirely persuasive.  Dr. Eiler issued an opinion based on the review of the records and not a physical examination of the claimant.  . . .  Dr. Eiler opined that the claimant could only occasionally reach overhead bilaterally, and occasionally reach in all other directions, handle, finger, feel, push, or pull with the left upper extremity.  . . .  This opinion

9

> was set forth three years post DLI [date last-insured] and is not supported by the record. Her opinion is too restrictive considering the entire relevant medical evidence. For example, there is no support [for the finding that] the claimant has limitations reaching with her right upper extremity. The claimant never reported right upper extremity pain or weakness. The record shows the claimant had grossly normal strength in her bilateral upper extremities, including intrinsic muscles of the hands and grip strength. In addition, despite her reports of constant pain, she was often observed to be in no acute distress. Additionally, she is able to drive, she maintained functional ranges of motion in her shoulders, elbows, wrists, hips, knees, and ankles, and, again, had grossly normal strength in her bilateral upper extremities, and there is no support for . . . limitations in reaching in all other directions.

(Tr. 27-28).[8]

Plaintiff maintains that this explanation by the ALJ was insufficient to justify her decision to reject Dr. Eiler's more-restrictive opinion concerning the left upper extremity, and that the ALJ's determination, that Plaintiff could use her left hand frequently, as opposed to only occasionally, is not supported by substantial evidence. In pertinent part, Plaintiff characterizes the ALJ's decision as follows:

> In her unfavorable decision, the ALJ found the opinion of Dr. Eiler to not be entirely persuasive. She arrived at this conclusion saying that the opinion was based only on a review of the record and not a physical examination and was set forth three years after the Plaintiff's date last insured. She further said that the opinion was not supported by the medical evidence in the record using one example regarding the right upper extremity. When determining the Plaintiff's RFC, the ALJ failed to incorporate any restrictions regarding the left upper extremity opined by Dr. Eiler. The ALJ discussed why the restrictions for the right upper extremity were improper, however she did not discuss the left upper extremity despite the medical record

---

[8] In setting forth this quoted language, rather than setting forth the ALJ's entire discussion of the evidence, the Court has set forth just those statements that arguably relate to the functioning of Plaintiff's left arm.

10

> substantiating Dr. Eiler's restrictions.
>
> ***
>
> The ALJ makes a conclusory statement about the opinion not being supported by the record and gives one example stating that there is no support that the claimant has limitations reaching with her right upper extremity.  Even if the Plaintiff were to concede that the ALJ's one example was correct, the failure to discuss the left upper extremity constitutes error.  There are numerous examples in the record that demonstrate the rationale for Dr. Eiler's opinion of restrictions of the left upper extremity.  The Plaintiff was seen by Dr. Tracy in December 2017.  At this visit she showed absent reflexes, diminished sensation in the triceps, both positive Tinel's and Spurling's.  On a repeat visit to Dr. Tracy in January 2018 the Plaintiff had diffuse weakness in the upper left extremity, weakness in the left bicep and triceps, and C6 and C7 sensory loss.
>
> ***
>
> The Plaintiff is not contending that the ALJ's RFC needs to perfectly match any single medical opinion in the record, however, it does need to be supported by substantial medical evidence.  In this case the ALJ dismissed Dr. Eiler's opinion as not being in line with the medical record, however she only gave an example of the right upper extremity with no discussion of the left upper extremity.  As outlined above, the restrictions of Dr. Eiler's [opinion] were reasonable based on the medical record, diagnostic testing and physical examination.

ECF No. 12-1 at pp. 13-14.

Defendant disagrees, insisting that the ALJ's decision is "supported by substantial evidence and must be affirmed."[9]

---

[9] *See, e.g.*, Def. Memo of Law, ECF No. 13-1 at p. 9 ("The ALJ considered Dr. Eiler's medical opinion under the Commissioner's regulations set forth at 20 C.F.R. § 404.1520c and found that it was not entirely persuasive. Tr. 27. In so finding, the ALJ noted that Dr. Eiler did not perform a physical examination of Plaintiff and completed the form three years after the date last insured. Tr. 27. The ALJ found that Dr. Eiler's reaching restriction with the right arm was not supported by the record as Plaintiff had never reported pain or weakness in the right arm. Tr. 27. The ALJ also found Dr. Eiler's left arm limitations unsupported and inconsistent with the record, including physical examination findings of grossly normal strength bilaterally, including in her hand and grip strength, and functional range of motion in her shoulders, elbows, wrists, hips, knees, and ankles. Tr. 27-28; see Tr. 904. Thus, contrary to Plaintiff's arguments, the ALJ properly considered Dr. Eiler's medical opinion and reasonably found portions of it, including with regard to her left arm restrictions, were not entirely persuasive as they were

DISCUSSION

"Although an ALJ's opinion 'need not perfectly match any single medical opinion in the record,' it must nevertheless be supported by substantial evidence." *Rucker v. Kijakazi*, 48 F.4th 86, 91 (2d Cir. 2022) (*quoting Schillo v. Kijakazi*, 31 F.4th at 78). Moreover, an ALJ may discount a portion of a medical opinion, provided that he gives a good reason for doing so. *See, Ramsey v. Comm'r of Soc. Sec.*, 830 F. App'x 37, 39 (2d Cir. 2020) ("To the extent the ALJ discounted portions of medical opinions, he provided sufficient reason for doing so, citing contradictory notes or other medical opinions."). That is, "[t]he ALJ cannot arbitrarily substitute his own judgment for competent medical opinion; rather, the ALJ's assessment of the relevant opinion must always be supported by substantial evidence in the record." *Schillo v. Kijakazi*, 31 F.4th at 75.  In that regard, "[w]e require that the crucial factors in any determination be set forth with sufficient specificity to enable us to decide whether the determination is supported by substantial evidence." *Id.* at 74.  In deciding whether an ALJ's decision is supported by substantial evidence, a court must consider the ALJ's decision as a whole. *See, Schillo v. Kijakazi*, 31 F.4th at 74 ("We conduct a plenary review of the administrative record to determine if there is substantial evidence, considering the record as a whole, to support the Commissioner's decision and if the correct legal standards have been applied.") (citation omitted).

Plaintiff argues that the ALJ's decision to reject a portion of Dr. Eiler's medical

---

inconsistent with substantial evidence in the record. . . .   [T]he ALJ properly considered Dr. Eiler's medical opinion and found it not entirely persuasive in light of the generally unremarkable physical examination findings from during the relevant period.").

12

opinion is unsupported by substantial evidence. In particular, and as set forth above, Plaintiff maintains that the ALJ focused on just one aspect of Eiler's opinion, concerning the right upper extremity, and failed to explain why Eiler's opinion was unreliable concerning Plaintiff's left upper extremity.

However, the Court finds that Plaintiff's description of the ALJ's analysis is not accurate. For example, Plaintiff asserts that "the ALJ failed to incorporate any restrictions regarding the left upper extremity opined by Dr. Eiler," but it is more accurate to say that the ALJ incorporated some, but not all, of those restrictions. Again, the ALJ found that Plaintiff was limited in using her left hand, but not to the extent indicated by Eiler.

More importantly, the ALJ discussed the reasons for such finding, contrary to what Plaintiff now argues. The Court previously set forth the ALJ's various statements concerning Plaintiff's upper extremities, and as can be seen, they are not limited to the matter alleged by Plaintiff. To be clear, Plaintiff asserts that the ALJ merely pointed out a flaw in Dr. Eiler's report concerning Plaintiff's right upper extremity, and used that flaw to disregard Eiler's opinion concerning the left hand, without any further discussion. Indeed, Plaintiff expressly argues that the ALJ failed to provide *any* discussion concerning the left upper extremity:

> The ALJ discussed why the restrictions for the right upper extremity were improper, however *she did not discuss the left upper extremity* despite the medical record substantiating Dr. Eiler's restrictions.
> ***
> In this case the ALJ dismissed Dr. Eiler's opinion as not being in line with the medical record, however she only gave an example of the right upper extremity with *no discussion of the left upper extremity*.

13

ECF No. 12-1 at pp. 13-14 (emphasis added).  In doing so, Plaintiff focuses on a single paragraph of the ALJ's decision.[10]  However, that contention is not true of the ALJ's decision as a whole.

Rather, considering the ALJ's decision as a whole, the ALJ offered the following reasons for her finding concerning Plaintiff's ability to use her left upper extremity: 1) Plaintiff admitted that after her August 2017 MVA, she remained "able to engage in light household chores such as cooking and cleaning during the period at issue"; 2) during the relevant period, Plaintiff pursued relatively "routine and conservative" treatment, consisting of chiropractic treatment, massage, and electrical stimulation, which provided "adequate relief"; 3) after her MVA, Plaintiff "continued to work until November 2017"; 4) the reason Plaintiff gave for stopping work was related to her back pain, not an inability to use her hands;[11]  5) Dr. Eiler reviewed medical records but did not examine Plaintiff; 6) Dr. Eiler formed her opinion three years after Plaintiff's last-insured date; 7) Dr. Eiler's opinion was not consistent with medical evidence overall, since, for example, Eiler opined that Plaintiff could only use her right upper extremity, but Plaintiff "never reported right upper extremity pain or weakness," and "[t]he record show[ed] [that Plaintiff] had grossly normal strength in her bilateral upper extremities, including intrinsic muscles of the hands and grip strength"; 8) "despite [Plaintiff's] reports of constant pain, she was often observed

---

[10] Even as to that one paragraph (beginning at the bottom of Tr. 27), Plaintiff's argument is inaccurate, since the ALJ provided more discussion concerning the upper extremities than what Plaintiff admits.  For example, the ALJ indicated that medical examination showed Plaintiff had normal strength in both of her arms and normal grip strength in both of her hands.

[11] (Tr. 655, 660) ("[Patient] reports that she has been feeling that her back is getting weaker and 'giving out on her a lot' and she has been having to 'hunch over' to walk and stand.  She reports that work has been aggravating her back pain and she would like to come out of work at this time to focus on healing.").

to be in no acute distress"; 9) Plaintiff remained "able to drive"; 10) Plaintiff "maintained functional ranges of motion in her shoulders, elbows, [and] wrists"; and 11) "there is no support for . . . limitations in reaching in all other directions [besides overhead]." (Tr. 26-28).

In sum, when finding that Plaintiff could use her left hand frequently as opposed to only occasionally, the ALJ gave various reasons, and did not focus solely on Dr. Eiler's unsupported finding concerning Plaintiff's right upper extremity, contrary to what Plaintiff maintains.  Consequently, the Court finds that Plaintiff's argument on this point lacks merit.

For essentially the same reasons, the Court also disagrees with Plaintiff's contention that the ALJ's decision is unsupported by substantial evidence.  In that regard, Plaintiff contends that "[t]here are numerous examples in the record that demonstrate the rationale for Dr. Eiler's opinion of restrictions of the left upper extremity." However, while there may be evidence that is consistent with Dr. Eiler's opinion concerning the left upper extremity, there is also substantial evidence supporting the ALJ's contrary finding.[12]

For example, as mentioned earlier, there is the completely normal ER physical examination performed in August 2017 after Plaintiff's MVA. (Tr. 894).   There is also the examination on December 6, 2017, by spinal surgeon Cameron Huckell, M.D. ("Huckell"), which indicated that Plaintiff claimed her left arm pain, numbness and paresthesias

---

[12] For example, as mentioned earlier, there is the completely normal ER physical examination immediately following the second of the two injuries which Plaintiff claims caused her to become disabled. (Tr. 894).

15

extended only to her elbow (and not to her hand), and which found that that she had functional range of motion of the shoulders, elbows and wrists, full strength bilaterally in the upper extremities, and firm grip strength bilaterally. (Tr. 902-904).  To the extent Plaintiff has identified other evidence indicating that she was more restricted than what the ALJ found, it does not entitle her to relief, since it is not the Court's prerogative to re-weigh the evidence.

## CONCLUSION

For the reasons discussed above, Plaintiff's motion (ECF No. 12) for judgment on the pleadings is denied, and Defendant's cross-motion (ECF No. 13) for the same relief is granted.  The Clerk of the Court is directed to enter judgment for Defendant and close this action.

So Ordered.

Dated: Rochester, New York
September 7, 2023

ENTER:

*Charles J. Siragusa*
CHARLES J. SIRAGUSA
United States District Judge